## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TAMEKA FLYTHE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DARBY BOROUGH, DARBY BOROUGH** | : | **NO.  05-5715** |
| **POLICE OFFICER TINA SELIMIS,** | : | |
| **Badge #22, DARBY BOROUGH POLICE** | : | |
| **OFFICER PARKER, Badge Unknown,** | : | |
| **Individually and as Police Officers for the** | : | |
| **Borough of Darby,** | : | |
| **Defendants.** | : | |

**DuBOIS, J.**                                                                                 **AUGUST 25, 2006**

**M E M O R A N D U M**

## I.      INTRODUCTION

On October 28, 2005, plaintiff Tameka Flythe filed suit in this Court under 42 U.S.C.

§ 1983 for alleged police misconduct and for punitive damages. The defendants are the Borough

of Darby, Darby Police Officer Tina Selimis, and Darby Borough Police Officer Keith Parker. Id.

at ¶¶ 3-5.

Presently before the Court are the defendants' motion for summary judgment and the

plaintiff's cross-motion for summary judgment. For the reasons set forth below, the plaintiff's

cross-motion for summary judgment is denied, and the defendants' motion for summary

judgment is granted in part and denied in part as follows: (1) the motion is granted with respect

to Officer Parker; (2) the motion is granted with respect to the Borough of Darby; (3) the motion

is granted with respect to the claim of punitive damages against Officer Selimis in her official

capacity; (4) the motion is granted with respect to the claim against Officer Selimis that the

pedestrian stop of Flythe was unreasonable; and (5) the motion is denied in all other respects.

**II.     FACTUAL BACKGROUND**

This case arose out of events occurring on the evening of June 1, 2005. Flythe and the defendants offer radically different accounts of what happened that evening. Accordingly, the Court first summarizes Flythe's version of the facts, and then summarizes the defendants' version of the facts.

**A.     Flythe's Version of the Facts**

On the afternoon of June 1, 2005, Flythe spent a couple of hours visiting her children, ages eight and ten, at their residence on 2229 Lloyd Street, Darby. Flythe Dep. 10-19. Their residence is located in a neighborhood referred to as the Paschall Homes. Id. at 16-17. Flythe testified that she spent some time playing basketball with her children that afternoon. Id.

Flythe denied consuming any alcoholic beverages, prescription medication, and illegal drugs that afternoon and in the twenty-four hour period prior to June 1, 2005. Id. at 19-20. Likewise, she denied ever using crack cocaine. Id. at 25, 51, 59. On the afternoon of June 1, 2005, she testified that she did not have a staggering gait, or bloodshot or dry eyes, and that she did not feel jittery, dizzy or lightheaded – all symptoms of using crack cocaine. Id. at 25-26.

When Flythe left her childrens' residence at approximately 6:35 p.m., she began to walk on Main Street to her sister's home, located at 121 Main Street. Id. at 20-21. She did not attempt to cross the street. Id. at 27-28. As Flythe was walking on Main Street, Officer Selimis detained and searched her without finding any contraband. Compl. ¶¶ 7-9; Flythe Dep. 22-24. In Flythe's words:

> [Officer Selimis] pulled up kind of in front of me. She had lights on. I stopped. She got out of the car, she came around because the way she pulled up, I would be on the passenger side of her vehicle. She came around to the passenger side, she asked me how I

was doing. I stated I was doing fine. She asked me where am I coming from. I have her
the address of my kids' home. She asked me where I was going. I said right up the street
to my sister's at 121 Main. She asked me do I have anything on me? Do I have any drugs
or anything on me, and I told her no. She asked me did I mind if she searched me. I said,
"No."

       She patted me down. She went into my pockets, she took out my keys, she placed
them on her car. She took out my asthma pump, placed it on the car. And she took my
driver's license. She held my driver's license in her hand. She asked me again what is my
address. Well, I gave her 214, but 121 is on my license, which is my sister's address,
which I stated to her.

       Then she put my asthma pump and my keys back in my pocket. She took my
driver's license. She went back around to her driver's door. She was in her car
approximately two minutes while I stood and waited, I guess, while she did a check. She
came back, she told me that I've been very cooperative with her, and she wanted to take
me in to do a more thorough search, and if I was clean, then she would release me.

Flythe Dep. 23-24.

      Officer Selimis then handcuffed Flythe. Flythe Dep. at 30. Flythe did not object to the

handcuffs, or to Officer Selimis's statement that she would take Flythe to the police station for

the purpose of conducting a more thorough search. Id. at 26, 31-32, 50-51.

      About ten minutes after the initial encounter between Officer Selimis and Flythe, Officer

Parker arrived on the scene. Id. at 27. Officer Parker transported Flythe to the Darby Borough

Police Station in his vehicle. Id. at 29-30. Before Flythe was placed in the vehicle, she

complained about the tightness of the handcuffs to Officer Parker. Id. at 29-30. In response, he

told her to wait until they arrived at the police station. Id. at 32. When they arrived at the police

station, Flythe again complained about the handcuffs to Officer Parker, and he instructed her to

wait until they entered the building. Id. at 29-30, 32, 36.

      During her first thirty minutes at the police station, Flythe sat in a chair with her hands in

handcuffs behind her back. Id. at 32, 34-35. After sitting in the chair "for a while," Flythe asked

Officer Parker to loosen the handcuffs once more. Id. at 35. He did nothing. Id. at 36. During this

time, Officer Parker sought information from Flythe, such as her name, age, weight, and height. Id. at 37, 46.

After about thirty minutes, Officer Selimis took the handcuffs off Flythe, then led her to a private area to conduct a strip search. Id. at 36-48. The strip search required Flythe to first remove her shirt and her bra, hand those items to Officer Selimis for inspection, and then dress in those items again. Then, Officer Selimis instructed Flythe to remove her pants and her undergarments, and hand those articles over for inspection. Selimis Dep. 42. While stripped of her pants and undergarments, Flythe was instructed to bend over with her buttock toward Selimis and cough. Flythe Dep. At 36-48. At this time, Officer Selimis conducted a visual cavity search of Flythe's anus. Selimis Dep. 43. Following the strip search and visual cavity search, which lasted several minutes and did not turn up any contraband or weapons, Officer Selimis allowed Flythe to dress. Id.; Flythe Dep. 36-48. Flythe does not recall the presence of other individuals at the place where the search was conducted. Flythe Dep. 40, 47-48.

Next, Officer Selimis placed Flythe in a cell. Selimis Dep. 50. Flythe remained in the cell for approximately thirty to forty minutes. Id. at 67-68. Then, Officer Selimis returned to Flythe's cell, returned her driver's license, and released her. Id. at 68. Flythe was not charged with any criminal offense. Id.

When Flythe left the police station, her wrists were red. Id. at 51. That night, she went to the Delaware Memorial Hospital emergency room for medical treatment because both her wrists "were extremely sore" and "bruised" from the handcuffs, and there was "a lot of redness and swelling." Def. Ex. H; Flythe Dep. 53-54, 56-57.[1] Medical records reflect that she was examined

---

[1] Flythe admitted that her wrists were not lacerated, cut, or scraped. Flythe Dep. 56-57

4

at 9:26 p.m., and there was no evidence of a fracture. Def. Ex. H. She was advised to use ice and over-the-counter Motrin for her pain. Flythe Dep. 54, 61. Flythe's hands and wrists continued to be sore for the following two days. Id. at 61. She did not seek additional medical treatment for her wrists. Id. at 57.

**B.     Defendants' Version of the Facts**

On June 1, 2005, at approximately 6:35 p.m., Officer Selimis observed Flythe stagger as she attempted to cross Main Street in Darby Borough. Selimis Dep. 17. Officer Selimis, who was operating an unmarked Darby Borough Police vehicle, drove up to Flythe and initiated a pedestrian stop. Id. at 16, 21. Officer Selimis asked Flythe, "where she was coming from." Id. at 17. Flythe replied that she was coming from the Paschall Homes and had just "smoked crack with her children." Id. at 17.[2] Officer Selimis observed that Flythe's "eyes were red and glassy, bloodshot, and she had a hyper-figity demeanor." Id.

Based on Flythe's admission that she had just smoked crack, and Flythe's appearance and gait, Officer Selimis conducted a pat down search of Flythe. Although the pat down search made Officer Selimis believe that Flythe probably did not have weapons or contraband, Officer Selimis thought that perhaps Flythe had weapons or contraband in places that a quick pat down search might not reveal. Selimis Dep. 29-30. Officer Selimis then handcuffed Flythe and put her in custody for "public drunkenness" and "disorderly conduct." Id. at 18-19, 22; Pl. Ex. 3, "Incident Report." Flythe did not resist her arrest in any way. Selimis Dep. 21.

---

[2] Police Chief Robert Smythe described the Paschall Homes as "one of our main problems in the town. We have a constant problem with people leaving Darby, going into the Paschall Projects to certain addresses that are known to us, getting narcotics and bringing them back in." Smythe Dep. 53.

Officer Parker arrived on the scene to assist Officer Selimis about five minutes after the initial stop. Id. at 21-22. Officer Parker transported Flythe to the Darby Borough Police Station. Parker Dep. 16-17; Selimis Dep. 23. Officer Selimis travelled in her vehicle directly behind the vehicle operated by Officer Parker. Selimis Dep. 26. At the police station, Flythe sat on a bench for five to ten minutes while Officer Selimis took down her information and processed her case. Id. at 26-33. Flythe was cooperative during this process. Id.

Officer Selimis then conducted a strip search of Flythe, including a visual cavity search, in a holding cell designated for female prisoners and/or detainees. Id. at 33-35, 43. Officer Selimis does not recall the presence of any other individuals in the area where the strip search was conducted. Id. at 36; Flythe Dep. 40. Officer Selimis next did a criminal background check,[3] learned that Flythe had no outstanding arrest warrants against her, and observed that Flythe was no longer intoxicated. Selimis Dep. 32, 49-51; Flythe Dep. 57. Selimis then released Flythe without any charges.

## III.    PROCEDURAL HISTORY

Flythe filed a Complaint in this Court on October 28, 2005, asserting causes of action under 42 U.S.C. § 1983 for federal civil rights violations (Count One) and for punitive damages (Count Two). Specifically, in Count One, Flythe alleges violations of her rights under the Fourth and Fourteenth Amendments "to be free from unreasonable searches and seizures, false arrest, excessive force, strip searches, to be secure in one's person and property, to access to the Courts,

---

[3]  The Court notes that Officer Selimis's testimony is inconsistent on this issue. First, she testified that she ran a criminal background check before the strip search. Selimis Dep. at 26, 32. Later, she testified that she actually conducted the check after the strip search, when she had placed Flythe in a cell. Id. at 50.

and to due process and equal protection of the law." Complaint ¶ 31.

On June 12, 2006, defendants filed a motion for summary judgment. Flythe filed a cross-motion for summary judgment and response in opposition to defendants' motion for summary judgment on June 14, 2006. Defendants filed a memorandum in opposition to Flythe's cross-motion for summary judgment on June 30, 2006.

## IV.    STANDARD OF REVIEW

A court should grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A "genuine" issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." Id.

"In determining the facts, the court should draw all reasonable inferences in favor of the nonmoving party." Id. at 255; Highlands Ins. Co. v. Hobbs Group, LLC, 373 F.3d 347, 351 (3d Cir. 2004). The nonmoving party, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982); see also Anderson, 477 U.S. at 249-50 (stating that summary judgment may be granted if the evidence is "merely colorable" or "not significantly probative"). In a summary judgment motion, the moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. However, where the nonmoving party bears the burden of proof, it must "make a showing sufficient to establish the existence of

7

[every] element essential to that party's case." Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp., 812 F.2d 141, 144 (3d Cir. 1987), citing Celotex, 477 U.S. at 323-24.

If reasonable minds can differ as to the import of the proffered evidence that speaks to an issue of material fact, summary judgment should not be granted.

**V.      DISCUSSION**

**A.      Overview**

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that defendants, acting under color of state law, deprived the plaintiff of rights secured by the Constitution or federal statutes. 42 U.S.C. § 1983. In the instant case, Flythe alleges, and defendants do not deny, that they acted under color of state law. Accordingly, the Court turns to the next step in analyzing a § 1983 claim, which "is to identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994). The Court begins this task by identifying the specific constitutional rights allegedly infringed by Officer Parker, the Borough of Darby, and Officer Selimis, in turn.

**B.      Liability of Officer Parker**

Flythe's claims against Officer Parker are based on his refusal to loosen her handcuffs. She alleged in the Complaint that such conduct on his part constituted excessive use of force and violated her constitutional rights. However, in her cross-motion for summary judgment, Flythe states that she "does not oppose dismissal of her claim for excessive use of force with respect to Defendants' use of handcuffs." Cross Mot. 2. Accordingly, the Court grants defendants' motion for summary judgment with respect to all claims against Officer Parker.

**C.    Liability of the Borough of Darby**

Flythe alleges that the Borough of Darby is liable for violating her Fourth and Fourteenth Amendment rights. Flythe claims that the Borough of Darby permitted and was deliberately indifferent to patterns, practices, and customs of, inter alia, unreasonable use of force by officers, false arrests, harassment, improper searches, and unlawful strip searches. In addition, Flythe faults the Borough of Darby for failing to properly train, investigate, and discipline officers who violate constitutional rights generally and who abuse strip searches specifically.

To succeed on these claims under 42 U.S.C. § 1983, Flythe must demonstrate that the Borough of Darby had a policy or custom that supported the alleged violations of her rights. Monell v. Dept. of Social Services, 436 U.S. 658,  692-95 (1978). Section 1983 liability attaches to a municipality only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id. at 694.

A government policy or custom can be established in two ways. Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986). A course of conduct is considered to be a "custom" when, although not authorized by law, "such practices of state officials [are] so permanent and well settled" as to virtually constitute law. Monell, 436 U.S. at 690 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)). Accord Anela v. City of Wildwood, 790 F.2d 1063, 1067 (3d Cir. 1986), cert. denied, 479 U.S. 949 (1986). In either case, it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom.

9

Andrews v. Philadelphia, 895 F.2d 1469, 1481 (3d Cir. 1990). "[A] municipality cannot be held

liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held

liable under § 1983 on a respondeat superior theory." Monell, 436 U.S. at 691.

In her cross-motion for summary judgment, Flythe points to the following facts in support

of her allegations against the Borough of Darby: First, Officer Selimis testified that, prior to the

incident involving Flythe, she was involved in "at least 100″ narcotics investigations and she

conducted over one-hundred strip searches. Selimis Dep. 12-14, 36. Second, Police Chief Smythe

admitted that police officers receive no training in strip searches, other than that provided in the

Police Academy. Smythe Dep. 43. Third, Police Chief Smythe and Officer Selimis admitted that

the police department did not have a written strip search policy, although a general search policy

was in place. See Section 20.007, Darby Borough Police Manual.[4] Smythe Dep. 36-38, 39-41;

Selimis Dep. at 56-57.

After carefully considering this evidence, the Court concludes that it does not support

Flythe's allegation that the Borough of Darby had a policy or custom that resulted in violations of

her constitutional rights. First, there is no evidence that the Borough of Darby had a policy or

custom of allowing officers to conduct strip and visual cavity searches in an unreasonable

---

[4] Section 20.007 reads:

Duty to Search Prisoners: It shall be the duty of every arresting officer to take such action as may be necessary to ensure that prisoners do not have concealed upon or about their person, any offensive weapons. In accordance with this section, male prisoners shall be subjected to a thorough search at the time of arrest. Female prisoners will be given a cursory search by the arresting officer, who will avoid coming in contact with private parts of the body unless there is apparent evidence indicating a weapon is concealed there. When women police officers are available, their services will be used to search female prisoners.

manner and without a legitimate governmental objective. The mere fact that Officer Selimis was involved in over one-hundred narcotics investigations and conducted over one-hundred strip searches does not establish that the Borough of Darby has a "blanket strip search" policy. Second, Flythe provided no evidence that the strip search training at the Police Academy was inadequate. Finally, the Court finds that there is no evidence to support Flythe's claim that Section 20.007 of the Darby Borough Police Manual, coupled with the training that the officers received at the Police Academy, was inadequate to guide Darby Borough Officers in conducting strip searches and visual cavity searches.

On the present state of the record, the Court concludes that Flythe has offered only bare assertions and conclusory allegations to support her claims against the Borough of Darby; they are insufficient to survive defendants' motion for summary judgment. Fireman's Ins. Co. v. DuFresne, 676 F.3d 965, 969 (3d Cir. 1982); see also Anderson, 477 U.S. at 249-50. Thus, the Court grants defendants' motion for summary judgment with respect to all claims against the Borough of Darby.

**D.     Liability of Officer Selimis**

**1.     Punitive Damages Claim Against Officer Selimis In Her Official Capacity**

In Count Two, Flythe claims punitive damages against Officer Selimis in both her official and individual capacity. To the extent that Flythe claims punitive damages against Officer Selimis in her official capacity, the Court grants defendants' motion for summary judgment.

The Supreme Court has held that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." Newport v. Fact Concerts, 453 U.S. 247, 271 (1981). The Supreme Court also has explained that official-capacity suits "generally represent only another way of

pleading an action against an entity of which an officer is an agent." <u>Monell v. New York City</u> <u>Dep't of Social Services</u>, 436 U.S. 658, 690 n.55 (1978). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Brandon v. Holt</u>, 469 U.S. 464 (1985).

Flythe's claim for punitive damages against Officer Selimis in her official capacity constitutes an official-capacity suit. Accordingly, it must be treated as a claim for punitive damages against the entity for which she is an agent – the Borough of Darby. Because the Borough of Darby is immune from punitive damages under 42 U.S.C. § 1983, Officer Selimis is also immune from punitive damages in her official capacity. Thus, the Court grants that portion of defendants' motion for summary judgment.

**2.      Unlawful Detention Claim Against Officer Selimis**

In the Complaint, Flythe alleges that Officer Selimis unlawfully detained her. In her cross-motion for summary judgment, Flythe states:

> According to the Defendant, after speaking to Plaintiff, Ms. Flythe explained that she was coming from Paschall Homes, a housing project close to the initial stop. . . . <u>The detention</u> although <u>initially reasonable</u> should have been limited in scope and should have lasted just long enough to allow the Defendant to ascertain whether Plaintiff was indeed drunk, as the investigation report so designates. Defendant then conducted a pat down. <u>Plaintiff concedes that Defendant Selimis' actions at this juncture were reasonable.</u>

Pl. Cross-Motion for Summary Judgment 10-11 (emphasis added). Based on Flythe's concession that Officer's Selimis's initial detention and pat down of Flythe was reasonable, the Court grants defendants' motion for summary judgment on Flythe's claim that the pedestrian stop was unreasonable.

12

3.      **All Other Claims Against Officer Selimis**

Flythe seeks summary judgment on her claims that Officer Selimis arrested her without probable cause, and subjected her to a strip search and visual cavity search which were not reasonably related to a legitimate governmental objective. In addition, Flythe seeks punitive damages against Officer Selimis in her individual capacity. Without considering the defendants' response, the Court notes that Flythe has, at best, presented evidence that raises genuine issues of material fact with respect to each of her claims. On the present state of the record, the Court is precluded from granting Flythe's motion for summary judgment.

In response to Flythe's motion for summary judgment, defendants argue that Officer Selimis did not act illegally and that, even if she did, she is entitled to qualified immunity. Flythe and the defendants vigorously dispute historical facts material to whether Officer Selimis is entitled to qualified immunity. Because a jury must resolve these facts, the Court must deny Flythe's motion for summary judgment for this additional reason. Likewise, that part of defendants' motion for summary judgment based on qualified immunity is denied on the ground that it presents genuine issues of material fact.

The subsequent analysis sets forth the qualified immunity standards, and the Fourth Amendment standards for arrests, strip searches, and visual cavity searches. The Court then applies these standards to the instant case.

A.      Qualified Immunity

The Court first examines Officer Selimis's claim that she is entitled to qualified immunity. "Qualified immunity shields public officials performing discretionary functions from § 1983 and Fourteenth Amendment liability insofar as their conduct does not violate clearly

13

established statutory or constitutional rights of which a reasonable person would have known."

Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 192 (3d Cir. 2005) (internal quotations and

citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court urged district courts to

resolve qualified immunity issues in excessive use of force cases "at the earliest possible stage in

litigation," even where factual disputes preclude a grant of summary judgment on the underlying

constitutional violation. Id. at 201. The Court stated that the requisites of a qualified immunity

defense must be considered in proper sequence. Id. at 200. First, a district court must determine

whether the facts alleged, taken in the light most favorable to plaintiff, show the officer's conduct

violated a constitutional right. Id. at 201. "If the plaintiff fails to make out a constitutional

violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity." Bennet

v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002). If the district court determines that a constitutional

violation could be made out on a favorable view of the parties' submissions, the next step is to

ask whether the constitutional right was clearly established. Saucier, 533 U.S. at 201. This

inquiry "must be undertaken in light of the specific context of the case, not as a broad general

proposition," and it "must be sufficiently clear that a reasonable official would understand that

what he is doing violates that right." Id. at 201, 202.

The Court of Appeals for the Third Circuit recently enunciated the qualified immunity

inquiry as follows:

> First, the court must determine whether the facts alleged show that the defendant's
> conduct violated a constitutional or statutory right. If so, the court must then determine
> whether the constitutional or statutory right allegedly violated by the defendant was
> "clearly established." If the court concludes that the defendant's conduct did violate a
> clearly established constitutional or statutory right, then it must deny the defendant the

protection afforded by qualified immunity.

Williams v. Bitner, 455 F.3d 186, 198 (3d Cir. July 15, 2006).

In the Third Circuit, "qualified immunity is an objective question to be decided by the court as a matter of law," although "[t]he jury . . . determines disputed historical facts material to the qualified immunity question." Id. at 194 n.12 (quoting Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004); Doe v. Groody, 361 F.3d 232, 238 (3d. Cir. 2004); Curley v. Klem, 298 F.3d 271, 279 (3d Cir. 2002)).

B.      Arrests

The Fourth Amendment prohibits arrest without probable cause. Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995). To prevail on a § 1983 claim for unlawful arrest, a plaintiff must establish that she was arrested without probable cause. Santiago v. City of Vineland, 107 F. Supp. 2d 512, 561 (D.N.J. 2000). Once a plaintiff in a § 1983 action demonstrates that she was arrested without a warrant and alleges that the arrest was made without probable cause, the burden shifts to the defendants to prove that probable cause existed. Dellums v. Powell, No. 75-1975 (D.C. Cir. Aug. 4, 1977), *7-*9. Probable cause to arrest exists when the facts and circumstances known to the arresting officer are sufficient to warrant a reasonable person to believe that an offense has been committed by the suspect. United States v. Stubbs, 281 F.3d 109, 122 (3d Cir. 2002); Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000). Summary judgment in favor of the arresting officer is only appropriate if the evidence, viewed in the light most favorable to the plaintiff, could not support a determination that an officer lacked cause to arrest. Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997); Sherwood v. Mulvihill, 113 F.3d 396, 402 (3d Cir. 1997).

15

C.      Strip Searches and Visual Cavity Searches

The Fourth Amendment bars law enforcement from conducting unreasonable searches. Blanket strip search policies violate detainees' Fourth Amendment rights. See, e.g., Weber v. Dell, 804 F.2d 796, 803 (2d Cir. 1986); Ward v. County of San Diego, 791 F.2d 1329, 1333 (9th Cir. 1986); Mary Beth G. v. Chicago, 723 F.2d 1263, 1272 (7th Cir. 1983). Likewise, body-cavity searches and strip searches violate the Fourth Amendment where such searches are "arbitrary or purposeless" and "unreasonable." Bell v. Wolfish, 441 U.S. 520, 539, 558 (1979). However, body-cavity searches and strip searches of pretrial detainees do not violate the Fourth Amendment if the searches are "conducted in a reasonable manner" and are "reasonably related to a legitimate governmental objective." Id. at 539, 560. As the Supreme Court explained, "[l]oss of freedom of choice and privacy are inherent incidents of confinement," id. at 537, despite the fact that a body-cavity search may "clearly [be] the greatest personal indignity" that one can suffer in confinement. Id. at 594 (Stevens, J., dissenting). Summary judgment in favor of an officer who conducts a strip search and visual cavity search is only appropriate if the evidence, viewed in the light most favorable to plaintiff, supports a determination that the officer's search was conducted in a reasonable manner and was reasonably related to a legitimate governmental objective.

D.      Qualified Immunity and Flythe's Claims In This Case

To analyze Flythe's claims, the Court first examines whether the facts alleged, taken in the light most favorable to Flythe, establish that Officer Selimis arrested Flythe without probable cause and subjected her to a strip search and a visual cavity search which were not reasonably related to a legitimate governmental objective. Then, the Court must determine whether the

16

Fourth Amendment rights that Officer Selimis allegedly violated were clearly established. If the Court concludes that the Officer Selimis's conduct violated clearly established constitutional rights, then it must deny Officer Selimis the protection afforded by qualified immunity.

Viewing the evidence in the light most favorable to Flythe, the Court concludes that she has presented evidence of violations of her Fourth and Fourteenth Amendment rights. According to Flythe, she was only walking along Main Street – without showing any signs of drug use or abnormal behavior – when Officer Selimis detained her and patted her down for weapons and narcotics. Although the pat down did not reveal any contraband, or even raise suspicions that Flythe had contraband on her person, Officer Selimis handcuffed and arrested her, transported her to the police station, strip searched her, conducted a visual cavity search, and finally held her in a cell before Flythe's release. According to Flythe, her proximity to the Paschall Homes – referred to by the police as a drug haven – is the only reason that Officer Selimis undertook that intrusive course of conduct.

Flythe correctly points out that mere proximity to a suspected drug haven is insufficient to create reasonable suspicion on the part of the police. See Sibron v. New York, 392 U.S. 40, 62-63 (1968); Brown v. Texas, 443 U.S. 47, 52 (1979). Thus, if Flythe's testimony is true, Officer Selimis's conduct exceeded the bounds of reasonableness, and Flythe has provided sufficient evidence of claimed violations of her Fourth and Fourteenth Amendment rights to withstand defendants' motion for summary judgment on qualified immunity grounds.

The Court next addresses the second prong of the qualified immunity analysis which requires it to determine whether the constitutional rights allegedly violated by Officer Selimis were clearly established at the time of the June 1, 2005 incident. The Court is unable to reach a

17

conclusion on this issue because Flythe and defendants vigorously contest how the June 1, 2005 incident occurred. Depending on whether a reasonable officer believed Flythe's or defendants' version of the encounter, a reasonable officer could conclude either that a constitutional violation occurred or that it did not. The conflicting evidence raises genuine issues of material fact. Thus, the Court denies that part of defendants' motion for summary judgment which is based on qualified immunity for Officer Selimis. The Court also denies Flythe's cross-motion for summary judgment on her claims that she was arrested without probable cause and subjected to a strip search and visual cavity search which were not reasonably related to a legitimate governmental interest.

## VI.    OUTSTANDING ISSUES OF FACT UNDER FORBES

As required by Forbes v. Township of Lower Merion, 313 F.3d 144, 146 (3d Cir. 2002), the Court must specify the facts relevant to qualified immunity that are in dispute. The Court identifies those issues, inter alia, as follows:

- what Flythe did at the Paschall Homes on the afternoon and evening of June 1, 2005;

- whether Flythe had a staggering gait, bloodshot or dry eyes, jitteriness, dizziness, and/or lightheadedness as she walked down Main Street;

- what was said during the conversation between Flythe and Officer Selimis;

- whether Flythe told Officer Selimis that she had just smoked crack with her children;

- whether Flythe was slurring her speech during her conversation with Officer Selimis;

- whether Officer Selimis arrested Flythe, and if so, whether she had probable cause to do so; and,

- whether Officer Selimis decision to conduct a strip search and visual cavity search of

18

Flythe was related to a legitimate governmental objective.

At trial, a jury will have to resolve these and perhaps other factual disputes which are relevant to the question of whether Officer Selimis is entitled to qualified immunity.

## VII.   CONCLUSION

The Court denies Flythe's cross-motion for summary judgment in its entirety. The Court grants in part and denies in part the defendants' motion for summary judgment as follows: (1) the motion is granted with respect to all of Flythe's claims against Officer Parker; (2) the motion is granted with respect to all of Flythe's claims against the Borough of Darby; (3) the motion is granted with respect to Flythe's claim of punitive damages against Officer Selimis in her official capacity; (4) the motion is granted with respect to Flythe's claim against Officer Selimis that the pedestrian stop was unreasonable; and (5) the motion is denied in all other respects. These rulings leave for trial (1) Flythe's 42 U.S.C. § 1983 claims based on violations of her rights under the Fourth and Fourteenth Amendments for arrest without probable cause, and strip search and visual cavity search which were not reasonably related to a legitimate governmental interest, and (2) Flythe's claim for punitive damages against Officer Selimis in her individual capacity.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TAMEKA FLYTHE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DARBY BOROUGH, DARBY BOROUGH** | : | **NO.  05-5715** |
| **POLICE OFFICER TINA SELIMIS,** | : | |
| **Badge #22, DARBY BOROUGH POLICE** | : | |
| **OFFICER PARKER, Badge Unknown,** | : | |
| **Individually and as Police Officers for the** | : | |
| **Borough of Darby,** | : | |
| **Defendants.** | : | |

**O R D E R**

_____**AND NOW**, this 25th day of August, 2006, upon consideration of the Motion of

Defendants, Darby Borough, Darby Borough Police Officer Tina Selimis and Darby Borough

Police Officer Parker for Summary Judgment (Document No. 10, filed June 12, 2006), Plaintiff's

Cross-Motion for Summary Judgment and Her Response in Opposition to Defendants' Motion

for Summary Judgment (Document No. 12, filed June 14, 2006), and Defendants' Memorandum

of Law in Opposition to Cross Motion for Summary Judgment of Plaintiff, Tameka Flythe

(Document No. 13, filed June 30, 2006), **IT IS ORDERED** that the Motion of Defendants,

Darby Borough, Darby Borough Police Officer Tina Selimis and Darby Borough Police Officer

Parker for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, as follows:

1.      The Motion is **GRANTED** with respect to all of plaintiff's § 1983 claims against

Officer Parker;

2.      The Motion is **GRANTED** with respect to all of plaintiff's § 1983 claims against

the Borough of Darby;

3.       The Motion is **GRANTED** with respect to plaintiff's claim of punitive damages

against Officer Selimis in her official capacity;

4.       The Motion is **GRANTED** with respect to plaintiff's § 1983 claim against Officer

Selimis that the pedestrian stop was unreasonable; and

5.       The Motion is **DENIED** in all other respects.

**IT IS FURTHER ORDERED THAT** Plaintiff's Cross-Motion for Summary Judgment

is **DENIED** in all respects.[1]

**IT IS FURTHER ORDERED** that the caption of the case is **AMENDED** to delete

Officer Parker and Darby Borough as defendants.

**BY THE COURT:**

**/s/ Honorable Jan E. DuBois**

**JAN E. DUBOIS, J.**

---

[1] These rulings leave for adjudication (1) plaintiff's 42 U.S.C. § 1983 claims based on violations of her rights under the Fourth and Fourteenth Amendments for arrest without probable cause, and strip search and visual cavity search which were not reasonably related to a legitimate governmental interest, and (2) plaintiff's claim for punitive damages against Officer Selimis in her individual capacity.

2